# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* NEWMAN, Minors.

UNPUBLISHED
September 22, 2016

Nos. 329063; 329076
St. Clair Circuit Court
Family Division
LC No.   15-000074-NA

Before:  GADOLA, P.J., and SERVITTO and SHAPIRO, JJ.

PER CURIAM.

The trial court erred by finding clear and convincing evidence of statutory grounds for terminating respondents' parental rights under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (j), and (k)(*iii*), and concluding that termination of parental rights was in the children's best interests. Accordingly, we reverse the trial court's termination orders and remand for further proceedings consistent with this opinion.

## I.  BACKGROUND

Respondents Chelsea Skotzke (Chelsea) and Reginald "Brandon" Newman (Brandon) have two children: LN, who was born in September 2012, and FN, who was born in October 2013.  On February 12, 2015, FN suffered second-degree burns to the palms of his hands and the soles of his feet.  The injury occurred in the mobile home in which Brandon's sister and mother lived on Dove Road in Port Huron.  According to Chelsea and Brandon they were visiting his family that day, but resided with Chelsea's mother on Hillcrest Court in St. Clair.

The only witnesses to the mechanism of FN's injury were respondents.  Their statements to the Department of Health and Human Services (DHHS), the police, and at trial were largely consistent, although they did contain some minor variations.[1]

According to respondents, in the afternoon of February 12, 2015, they were at the mobile home where Brandon's sister and mother lived.  Chelsea was napping and Brandon was supervising the children in the kitchen where there was a cake.  He left the kitchen momentarily and when he returned, he found that the children had gotten into the cake, made a mess, and had cake and icing all over themselves.  He pulled FN from the cake, and FN, being about 16 months old, started screaming and crying.  Brandon undressed FN, took him to the bathroom, and placed

---

[1] The inconsistencies in respondents' statements will be discussed later in this opinion.

-1-

him standing up in the empty bathtub. He turned on the water, but did not plug the drain. He then left the bathroom to get LN, undress her, and put her in the tub as well.

In order to get to the bathroom, Brandon had to pass through the bedroom where Chelsea was sleeping. The noise of FN crying and Brandon walking through the room woke her up. She went into the bathroom within a minute after Brandon left. FN was still screaming. She saw that FN was sitting all the way in the back of the tub away from the faucets. Photos were entered into evidence showing that the tub was quite large with the faucets on one end of it and the drain located in the center.[2] Chelsea saw that FN had burns on his feet and hands and called for her husband, who screamed when he saw FN's injuries. Chelsea felt the running water and discovered that it was extremely hot. She attempted to turn on the cold water tap, but no cold water came out. The parents pulled FN out of the tub, wrapped him in a towel, and called 911. An ambulance and police car arrived, and the ambulance transported FN and Chelsea to the hospital while Brandon followed in a car.

Unfortunately, the record does not contain any of FN's medical records, and it does not appear that they were admitted into evidence. Nor was testimony heard from any of the physicians that actually treated FN, either in or out of the hospital. It appears uncontested, however, that upon arrival at the hospital FN was diagnosed with second-degree burns on the soles of his feet and on the palms of his hands.[3] He was admitted and remained in the hospital for 13 days receiving treatment.

During FN's hospitalization, his mother was permitted to be with him without supervision, and his father could be with him so long as the mother was present as well. LN continued to live with her mother without incident. FN was released from the hospital to the care of his mother on or about February 25, 2015, and he resided with her until March 9, 2015. On that date both FN and LN were removed from their mother's home without warning. From that date until today, respondents were not permitted to visit with either of their children, even on a supervised basis.

From removal, the proceedings moved quickly to an adjudication jury trial on June 30, 2015 and termination on August 5, 2015. Between the two proceedings, no parent-agency plan was prepared, and the trial court did not order that the parents undergo psychological evaluations or order any services.

The parents were each represented by appointed counsel whose litigation strategy is difficult to discern. Rather than admit to the non-abuse allegations in the petition, the parents demanded jury trials as to jurisdiction. The sole medical witness to testify at that trial was Dr. Mary Lou Angililli, the hospital's child abuse consultant. Dr. Angililli's opinion that the burns were intentionally inflicted was fully known to counsel for both parents. Nevertheless, neither

---

[2] The investigating detective described it as a "large soaking type tub," which is consistent with the photographs in the record.

[3] As explained at trial, a first-degree burn is like a sunburn, a second-degree burn is one that goes partially through the skin, and a third-degree burn is a full-thickness burn, meaning it has gone all the way through the skin to the muscles or nerves below.

attorney moved for funds to retain a child-abuse expert to review the case. Further, despite the attorneys' representations that the burn specialist or some other treating physician had opined that the burns were accidental, neither attorney called any of the treating physicians to testify.[4]

As is proper, the jury was not asked to determine which of the petition's allegations were true. Rather it was asked to determine if *any* of the possible grounds for jurisdiction had been shown by a preponderance of the evidence. Thus, the jury was instructed that the court would have jurisdiction if any of the following existed: (1) the parent failed to provide proper or necessary support, education, medical, surgical, or other care necessary for the child's health or morals; (2) the child was abandoned by the parents, (3) the child was subject to a substantial risk of harm to his or her mental health, or (4) the child's home or environment was unfit "by reason of neglect, cruelty, drunkenness, criminality, or depravity . . . ." MCL 712A.2(b).

After the jury reached its general verdict of jurisdiction, the attorneys for each of the parents requested supervised visitation. The trial court summarily denied it without explanation other than this statement:

> Well, that's not going to happen until after the determination is made on the issue of termination. The current orders will continue pending that decision. I will schedule a hearing for purposes of establishing the best interest of the minor children—or receiving evidence related to the best interest of the minor children and determination based on this record that is made at this trial.[5]

## II. STATUTORY GROUNDS FOR TERMINATION

---

[4] At one point, one attorney indicated that he was relying on the prosecution to subpoena those physicians to testify.

[5] Respondent parents have not argued on appeal that the lower court erred by denying supervised visitation or a parent-agency plan of services when requested at the preliminary hearing and again at the conclusion of the adjudication trial. Accordingly, that issue is not before us. However, the inability of the department to observe the children and parents together and the inability to observe the parents' response to services greatly limited the facts available for the determination of the factual questions before the court, and in our view, greatly increased the likelihood of error as to those questions. Unfortunately, there does not appear to be any caselaw providing guidance as to when a denial of all services including even supervised visitation is an abuse of discretion, and as noted above, neither the magistrate nor the judge provided any grounds for that denial other than that it had the discretion to do so. If the only test is whether the court has such discretion, see MCL 712A.19b(4), then it would seem that the discretion cannot be abused, i.e. that the discretion is wholly unfettered and unreviewable. It is questionable whether this was the legislature's intent and whether it comports with due process. In the absence of briefing on the issue, however, we will not explore the issue here other than to note its potential significance. Additionally, we also note that that the problem is compounded by the fact that respondents were apparently not appointed counsel when the initial denial of parenting time occurred.

Petitioner alleged that the burns to FN's palms and soles were intentionally inflicted by one or both parents, presumably as punishment for having made a mess in the kitchen. The trial court agreed.[6]

The parent's explanation of how FN was burned has been consistent throughout: FN was left standing up in a large tub with the drain open and only the hot water running. They theorize that he stepped into the hot water, burning the soles of his feet and then attempted to get out of the water and to the other side of the tub where there was no water. In doing so, he lost his balance and caught himself with his hands so as not to fall into the water, thereby burning his palms. He then got to the far side of the tub where he was found by his parents.

The parents' explanation may be false and their son's injuries a result of abuse. However, this scenario was not rebutted by the petitioner, let alone by clear and convincing evidence.[7] Petitioner's proofs were limited to the testimony of a single physician who never spoke to the parents, never saw the tub, and had no information about depth or the temperature of the water. The investigators did not make a serious attempt to test the water depth or temperature, determine if the cold water pipes in the trailer had a history of freezing,[8] and if so, to consider the effects of the sub-zero temperatures on the day of the incident.

Dr. Angililli testified that in child abuse cases 95% of the case turns on the "history," i.e. the description of the events and the child's presenting condition. However, she had little, if any, interest, in the history. She did not speak with the parents and conceded that she never called them nor sought to speak with them at the hospital except on one occasion when she could not locate them. She instead relied almost exclusively on statements by DHHS personnel and their second-hand description of the parent's statements.

Dr. Angililli's conclusions were based completely on the burn pattern. However, her testimony in this regard rested on a very weak foundation. She noted that the burns were all of about equal depth and did not evidence splashing. She explained that typically if a child is accidentally placed in hot water the burns will be of varying depth and that a consistent depth is evidence of intentional immersion by a third party. However, she never testified how any of the

---

[6] Before a court may terminate parental rights, the petitioner must prove the existence of at least one statutory ground for termination by clear and convincing evidence. *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013). "This Court reviews for clear error the trial court's factual findings and ultimate determinations on the statutory grounds for termination." *In re White*, 303 Mich App 701, 709; 846 NW2d 61 (2014). A trial court's factual findings are clearly erroneous if we are definitely and firmly convinced that the trial court made a mistake. *Id*. at 709-710.

[7] The petitioner bears the burden of proving by clear and convincing evidence that statutory grounds for termination exist. See MCR 3.977(A)(3); *In re Trejo*, 462 Mich 341, 355; 612 NW2d 407 (2000).

[8] There was testimony from Sherry Newman, the owner of the mobile home and Brandon's mother, stating that the cold water pipes were frozen on the day of the incident, February 12, 2015. She also testified that the pipes had frozen on several other occasions and that she had complained to the trailer park management without success.

burns could have been deeper than the thin layer of water in the tub as described by the parents. If there is only ½ inch of water, it is difficult to see how there could be burns of greater depth regardless of whether the exposure was accidental or intentional. Similarly, while it is clear that splashing to the arms and other parts of the body would result from a child who is immersed in a significant depth of water attempting to escape, that is less clear where (1) the water was not more than ½ inch deep and (2) there was a part of the tub to which the child could escape further contact with the water. Dr. Angililli also testified that a second-degree burn from hot water can occur in anywhere from two seconds to several minutes depending on the temperature of the water. Nevertheless, she did not inquire about the temperature of the water, and petitioner did not seriously investigate that question by inspecting the hot water heater or making other inquires. Dr. Angililli also testified that the child was likely held while being burned because a child of 16 months would be able to climb out of a bathtub unless restrained. She was, however, unaware that the bathtub in question was deeper than a normal tub, and she had not seen any photographs of it.

The claimed inconsistencies in the parents' statements are relatively minor and do not concern the actual mechanism of injury. Rather, they concern such details as which parent pulled the child from the tub and handed him to the other parent, whether the child was sitting or standing when taken out of the tub, whether the mother was kneeling or standing next to the tub, and the reason that the father initially left the two children with the cake in the kitchen.

The parents never declined to speak with Child Protective Services (CPS), any of the physicians, or any other investigator. Indeed, the initial CPS report, filed after FN's hospitalization but before receipt of Dr. Angililli's opinion, stated that "the injury appears consistent with the explanation. Chelsea and the fiancé have been forthcoming and cooperative."

The sole evidence that FN's burns were intentionally caused was the opinion of Dr. Angililli. Her testimony is not clear and convincing evidence given that she did not speak with the parents despite her statement that 95% of the determination comes down to history and her lack of knowledge regarding the mechanism of injury, i.e. the type of tub, the temperature of the water, the history of pipes freezing. Moreover, the parents immediately called 911, cooperated with the police, were not charged with a crime, and their children had no prior history of burns or other suspicious injuries. The proper course in this case following adjudication would have been to complete the investigation, to have the parents undergo psychological evaluations, and to have provided them with services and supervised visitation. Only by these means could the trial court have had the information necessary to determine by clear and convincing evidence whether or not abuse occurred and if so, whether such an incident could in the future be reliably avoided.

Accordingly, for these reasons, we conclude that there was not clear and convincing evidence of statutory grounds to terminate respondents' parental rights.

## III.  BEST INTERESTS

The law presumes that it is in the best interest of any child, absent abuse or neglect, to be in the custody of his parents. *In re Sanders*, 495 Mich 394, 410; 852 NW2d 524 (2014), citing *Troxel v Granville*, 530 US 57, 68-69; 120 S Ct 2054; 147 L Ed 2d 49 (2000). In this case, the trial court concluded that given the intentionally inflicted injury to FN and the mother's wish to

have the father move back into the family home, it was in the children's best interests that their parents' parental rights be terminated.

In doing so, the trial court notably ignored testimony of the parent/child bond by describing it as only evidence of the *parents'* bond with the children and noting:

> there is no evidence about the *children's* bond with the parent. Nothing about how the children behaved around the parents. Nothing about how the children cries if the parent's [sic] aren't there, nothing about that. [Emphasis added.]

This finding was clearly erroneous for several reasons. First and foremost, given that the court never allowed even supervised visitation, it is difficult if not impossible to see how the parents could have presented "neutral" testimony about the existence of a parent/child bond. Thus, it is impossible to know whether visitation would have shown a close and mutual child/parent bond because of the court's perpetual denial of any visitation. Similarly, given that no services were offered, there was no one, other than lay persons, who could offer testimony as to the parents' relationship with the children. The lay testimony that was presented indicated a strong bond. Directly contrary to the trial court's finding, there was testimony that the children cried when removed from their parents. Further, a family member who described Chelsea as a "good mother," stated that "Chelsea and her two children have a good bond" and that the children were well-nourished and properly dressed. A child care provider, who had the children in her home regularly, testified that Chelsea was "really great with them [and] they seem to love her . . . they always had clothing . . . she'd have snacks when I watched them, any medicine they would need." A third witness testified that FN and LN regularly had play dates with her children and described Chelsea as "caring [and] attentive to them." That same witness described Brandon as gentle and appropriate with the children. She stated that she had left her children with respondents in the past and that she would not be concerned about doing so in the future. A fourth witness stated that she regularly saw LN and FN and respondents and described them as "two very well behaved and happy children and they are very good parents to them." Thus, the trial court's contrary finding was clearly erroneous on the evidence presented.

## IV. CONCLUSION

There was not clear and convincing evidence of statutory grounds for termination in this case. Nor was there a preponderance of the evidence supporting the trial court's best interests' decision. Accordingly, we reverse the termination orders and remand to the trial court so that it may continue to exercise jurisdiction over the children. On remand, the trial court shall issue orders for further evaluation of the parents, preparation of a parent-agency plan, visitation, and continued monitoring by the court, after which final disposition may be properly determined. We do not retain jurisdiction.

/s/ Michael F. Gadola
/s/ Deborah A. Servitto
/s/ Douglas B. Shapiro

-6-